IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY ANN CIARLONE, et al. | : | Civil Case |
|     Plaintiffs, | : | |
| | : | |
| v. | : | No. 09-310 |
| | : | |
| CITY OF READING, et al. | : | |
|     Defendants, | : | |

**MEMORANDUM OPINION**

**Stengel, J.**                                                                                         **January 19, 2011**

Mary Ann Ciarlone owns property located at 511 Oley Street, Reading, Pennsylvania. Irene Lora, Orazio Gerbino, and Anne Baez each rent an apartment at the property. The City of Reading sent notice to Ms. Ciarlone that the property would be inspected. Ms. Ciarlone requested the inspectors obtain a search warrant. The inspectors obtained a search warrant, and returned to conduct the inspection. The inspectors did not inform the tenants of the inspection or search warrant and used a sledge hammer to gain access to the property.

Thomas McMahon, Jatinder Khokhar, and Ryan Hottenstein filed this motion for summary judgment.[1] For the reasons set forth below, I will grant the motion.

---

[1] The City of Reading, Code Enforcement Administrator Brad Reinhart and Code Enforcement Inspector James Orrs have filed a separate motion for summary judgment and plaintiffs filed a partial motion for summary judgment. These motions are addressed in separate memorandum opinions and/or orders.

I. Background

Mary Ann Ciarlone owns a residential rental property at 511 Oley Street, Reading, Pennsylvania.[2] Irene Lora, Anne Baez, and Orazio Gerbino live as tenants at 511 Oley Street. Defendants' Statement of Facts at ¶¶ 2-4. Brad Reinhart is the codes administrator for the City of Reading, id. ¶ 5, and James Orrs was a property maintenance inspector for the City of Reading, id. at ¶ 6. Thomas McMahon is the Mayor of the City of Reading. Id. at ¶ 7. In 2008, Ryan Hottenstein was the managing director of the City of Reading. Id. at ¶ 8. On October 10, 2008, Jatinder Khokhar was the manager of the office of building inspections and zoning services. Id. at ¶ 9.

Through a letter dated September 24, 2008, the City of Reading notified Ms. Ciarlone that a property maintenance inspection for 511 Oley Street was scheduled for October 7, 2008. Defendants' Statement of Facts at ¶ 17. The City of Reading did not provide notice of the inspection to the tenants. Id. at ¶ 18. At the request of Ms. Ciarlone, Mr. Orrs obtained a search warrant. Mr. Orrs, Mr. Reinhart, and a police officer went to the property to execute the warrant on October 10, 2008. Defendants' Statement of Facts at ¶ 41. No one was at the property. Mr. Reinhart asked Mr. Orrs to call Ms. Ciarlone and inform her they would return that afternoon to execute the warrant. Id. at ¶ 45. At approximately 4:00 p.m. Mr. Reinhart and Mr. Orrs returned to the

---

[2] See Defendants, City of Reading, Thomas McMahon, Ryan Hottenstein, Brad Reinhart, Jatinder Khokhar and James Orrs' Statement of Undisputed Facts at ¶ 1, Ciarlone v. City of Reading, No. 09-310 (E.D. Pa. filed Nov. 10, 2010).

property with two officers. Id. at ¶ 47. After 50 minutes of requesting Ms. Ciarlone to open the door, they used a sledge hammer to gain access to the property. Id. at ¶¶ 54, 69. They also used the sledge hammer to gain access to the tenants' apartments. Id. at ¶ 71.

In 2008 Mr. Khokhar was the manager for the offices of building inspections, zoning services, and code enforcement. Defendants' Statement of Facts at ¶ 83. In July or August 2008, the responsibilities for the code enforcement division were taken from Mr. Khokhar and given to Mr. Reinhart. Id. at ¶ 85. In October 2008, Mr. Khokhar had no supervisory responsibilities for the code enforcement division, was not responsible for the division's training, and did not have authority to fire or discipline Mr. Reinhart or Mr. Orrs. Id. at ¶ 87. Prior to the execution of the search warrant on 511 Oley Street, Mr. Khokhar did not know anything about the scheduled inspection or that a search warrant had been issued. Id. at ¶ 88.

As managing director for the City of Reading, Mr. Hottenstein was responsible for the overall management of city operations. Defendants' Statement of Facts at ¶ 94. Prior to the execution of the warrant, Mr. Hottenstein did not know anything about the scheduled inspection of 511 Oley Street or about the execution of the search warrant. Id. at ¶ 101.

Mayor McMahon helps formulate policy, goals and objectives for the City of Reading on a "macro level." Defendants Statement of Facts at ¶ 103. He does not create procedures for the code enforcement division. The heads of the departments are

responsible for creating procedures. Id. at ¶ 104. Mayor McMahon testified the department heads are responsible for investigating and disciplining the employees in their departments. Defendants' Statement of Facts at Exh. 7 at 138.

Mayor McMahon explained his administration "possibly" had a "zero tolerance policy towards code enforcement" that was not documented. He hoped "that code enforcement would not neglect violations or enforcement of ordinances for violations." Plaintiffs' Statement of Facts at Appendix F at 54-56, Ciarlone v. City of Reading, No. 09-319 (E.D. Pa. filed Nov. 12, 2010). He testified at his deposition that the police accompany code enforcement officers to give the inspections legitimacy and it has been a policy of his administration to "get landlords to take the property inspection scheme more seriously." Id. at 61.

Mayor McMahon's administration had a goal to "limit rental housing to the elderly and to the special needs." Plaintiffs' Statement of Facts at Appendix F at 33. This is in part because of the "broken windows theory,"[3] which promotes stability in a

---

[3] In his 2006 State of the City Speech, Mayor McMahon summarized the "broken windows theory" as:

> James Q. Wilson and George Kelling developed the "broken windows" thesis to explain the signaling function of neighborhood characteristics. This thesis suggests that the following sequence of events can be expected in deteriorating neighborhoods:
>
> Evidence of decay (accumulated trash, broken windows, deteriorated building exteriors) remain in the neighborhood for a reasonably long period of time. People who live and work in the area feel more vulnerable and begin to withdraw. They become less willing to intervene to maintain public order (for example, to

neighborhood to reduce crime. See Plaintiffs' Statement of Facts at Exh. F at 35.
Between 2007 and 2008, there was a 400 percent increase in conviction rates for code violations. Id. at 50. In addition, Karen Organtini, a clerk with the property maintenance division, was deposed in 2009. She testified that for the two years preceding the deposition there had been a shift in policy regarding property maintenance inspections to make them "more intense." Plaintiffs' Statement of Facts at Appendix A at 25.

Prior to the execution of the search warrant at 511 Oley Street, Mayor McMahon never discussed or suggested to anyone that an inspection of the property should be conducted or that a warrant should be obtained. Defendants' Statement of Facts at ¶ 107. He also did not discuss how the warrant should be executed. Id. at ¶ 108.

The City of Reading provides training to its property maintenance inspectors,

---

attempt to break up groups of rowdy teens loitering on street corners) or to address physical signs of deterioration.
Sensing this, teens and other possible offenders become bolder and intensify their harassment and vandalism.

Residents become yet more fearful and withdraw further from community involvement and upkeep. This atmosphere then attracts offenders from outside the area, who sense that it has become a vulnerable site for crime.

The "broken window" theory suggests that neighborhood order strategies such as those listed below help to deter and reduce crime.
• Quick replacement of broken windows
• Prompt removal of abandoned vehicles
• Fast clean up of illegally dumped items, litter and spilled garbage
• Quick paint out of graffiti
• Finding (or building) better places for teens to gather than street corners
• Fresh paint on buildings
• Clean sidewalks and street gutters

including International Code Council seminars.  See Defendants' Statement of Facts at Exh. 6 at 16-17.  In June 2008, the City of Reading conducted a required training session for all code enforcement officers.  Id.; Defendants' Statement of Facts at Exh. 5 at 37-38.[4] The June 2008 instructors included attorneys from the law firm of Deasey, Mahoney, Valentini & North, Ltd. and Captain Drexler and Sergeant Monteiro of the City of Reading Police Department.  See Defendants' Statement of Facts at Exh. 6 at 60; Defendants' Statement of Facts at Exh. 22.  The training included training on the right to entry, how to prepare an affidavit of probable cause, prohibition against retaliation, sensitivity to the possible perception of harassment and intimidation, and civil rights under the Fourth Amendment to the United States Constitution.  See Defendants' Statement of Facts at Exh. 22.  There was no training on the use of force during a planned routine inspection.  There were no written guidelines or standard operating procedures for serving administrative search warrants.

The Complaint alleges a Fourth Amendment unreasonable search claim, a violation of the right to privacy claim, a First Amendment retaliation claim, and a failure to train claim against Mr. Khokhar, Mr. Hottenstein, and Mayor McMahon.  Mr. Khokhar, Mr. Hottenstein, and Mayor McMahon filed a motion for summary judgment alleging plaintiffs fail to establish they are personally liable for any constitutional

---

[4] Plaintiffs maintain this training did not occur until February, 2009.  Mr. Khokhar, Mr. Reinhart, and Mr. Orrs all testified that there was training in June 2008.  Mr. Reinhart and Mr. Orrs testified training also occurred in February 2009.

violation and fail to establish they are liable for a failure to train the code enforcement division employees.

II. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" Fed. R. Civ. P. 56(c)(1).

Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III. Discussion

    A. Individual Liability

Plaintiffs' complaint alleges an unreasonable search and seizure claim (Count I), a violation of the right to privacy claim (Count III), and an unconstitutional retaliation

claim (Count IV) against Mr. Khokhar, Mr. Hottenstein, and Mayor McMahon.[5]

A defendant is liable under § 1983 only if he personally was involved in the alleged constitutional violation. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997), abrogate in part on other grounds by Burlington N. And Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). A plaintiff can sue a defendant in a personal capacity action under two theories of supervisory liability. See A.M. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004); accord Hill v. City of Phila., 2008 WL 2622907, at *5 (E.D.Pa. June 30, 2008). A plaintiff can establish supervisory liability if he shows a supervisor "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." A.M. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d at 586 (quoting Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir.1995)); accord Santiago v. Warminster Twp., – F.3d –, 2010 WL 5071779, at *4 (3d Cir. Dec. 14, 2010). Alternately, a plaintiff can establish supervisory liability if he shows the defendants "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused [the] constitutional harm." Id. (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir.1989)).

---

[5] These claim also are alleged against the City of Reading, Mr. Reinhart, and Mr. Orrs. The allegations against the City of Reading, Mr. Reinhart, and Mr. Orrs are addressed in a separate memorandum opinion.

1. <u>Jatinder Khokhar</u>

Mr. Khokhar had no responsibility for the code enforcement division in October 2008.[6] He did not order an inspection of the property or order anyone to obtain a search warrant for the property. Mr. Khokhar learned of the search of the property after it occurred. Mr. Reinhart and Mr. Orrs testified Mr. Khokhar did not know anything about the scheduled inspection or that they had obtained a search warrant. They also testified Mr. Khokhar did not order, direct, or suggest a search warrant be executed or order, direct, or suggest how the search warrant should be executed.

Plaintiffs fail to establish a jury could find Mr. Khokhar "participated in violating the plaintiff[s'] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." There are no facts developed during discovery which might show any involvement by Mr. Khokhar. He was not involved and about that there is no question of fact at all.

2. <u>Ryan Hottenstein</u>

Plaintiffs fail to establish a jury could find Mr. Hottenstein "participated in violating the plaintiff[s'] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." Mr. Orrs and

---

[6] Mr. Khokhar was removed from his position as manager of the code division in July or August 2008. Mr. Khokhar was the manager of three divisions, the offices of building inspections, zoning services, and code enforcement. The responsibilities over the code enforcement division were taken away from Mr. Khokhar and given to Mr. Reinhart.

10

Mr. Reinhart testified that Mr. Hottenstein did not know anything about the scheduled search or its execution until after it occurred. He did not direct, cause, or suggest a search warrant be obtained or order, cause, or suggest how the warrant should be executed.

        3.    <u>Mayor Thomas McMahon</u>

Mr. Orrs and Mr. Reinhart testified Mayor McMahon did not know anything about the scheduled search or its execution until after it occurred. He did not direct, cause, or suggest a search warrant be obtained or how the warrant should be executed.

Mayor McMahon's administration had a goal of limiting rental housing to the elderly and to those with special needs. Mayor McMahon was concerned with the "broken windows theory," and believed a reduction in rental housing would result in a reduction in crime. Code enforcement under his administration had become more strict and there was a 400 percent increase in convictions for code violations from 2007 to 2008. In addition, plaintiffs maintain Mayor McMahon replaced Mr. Khokhar with Mr. Reinhart to enforce the new policy.

Plaintiffs fail to establish a jury could find Mayor McMahon is liable for any constitutional violation. The McMahon administration policy to reduce code violations and its policy limiting rental housing to the elderly and to those with special needs do nothing to establish Mayor McMahon participated in any violation of the plaintiffs' rights. Plaintiffs also have not established and show no proof at all that these policies

were a direct cause of any violation of plaintiffs' constitutional rights.

4.  Conclusion

I will grant Mr. Khokhar, Mr. Hottenstein, and Mayor McMahon summary judgment for plaintiffs' unreasonable search and seizure claim, violation of the right to privacy claim, and unconstitutional retaliation claim.

B.  Failure to Train

Count II of plaintiffs' complaint raises a failure to train claim against Mr. Khokhar, Mr. Hottenstein, and Mayor McMahon.[7]

"[T]he standard for personal liability under section 1983 is the same as that for municipal liability." Carter v. City of Phila., 181 F.3d 339, 356 (3d Cir. 1999). "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under § 1983." Id. If "the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). The "failure to train may amount to

---

[7] The failure to train claim also is alleged against Mr. Reinhart. The allegations against Mr. Reinhart are addressed in a separate memorandum opinion.

deliberate indifference where the need for more or different training is obvious, and inadequacy very likely to result in violation of constitutional rights." Id.

        1.     <u>Jatinder Khokhar</u>

After August 2008, Mr. Khokhar was not responsible for the code enforcement division. Mr. Reinhart was authorized to develop new policies and procedures for the code enforcement division.

Mr. Khokhar arranged training for the code enforcement division when he was in charge. In June 2008, four months before the execution of the search warrant at 511 Oley Street, the City of Reading conducted a training session for all code enforcement officers. The training addressed the right of entry, preparation of an affidavit of probable cause, prohibition against retaliation, sensitivity to the possible perception of harassment and intimidation, and the Fourth Amendment.

Plaintiffs fail to establish a genuine issue of material fact about Mr. Khokhar's involvement. There is no basis in the facts of this case to find Mr. Khokhar deliberately indifferent to the plaintiffs' rights. When he was manager of the code enforcement division, he provided training to the property inspectors. Even if the training was inadequate (a proposition for which there is no support), plaintiffs fail to establish that the need for additional training was obvious or that inadequate training was likely to cause a violation of plaintiffs' constitutional rights.

### 2. Ryan Hottenstein and Mayor Thomas McMahon

Plaintiffs fail to establish a genuine issue of material fact for the failure to train claim against Mr. Hottenstein and Mayor McMahon.

Even if they had a responsibility to assure training, a reasonable jury could not find that they were deliberately indifferent to the plaintiffs' rights. Mr. Khokhar had arranged training for the code enforcement officers in June 2008. Even if the training was inadequate, plaintiffs fail to establish a jury could find the need for additional training was obvious or that inadequate training was likely to result in a violation of constitutional rights. Same as Mr. Khokhar, there are no facts at all to show "inadequate training" and no question of fact over whether any "inadequate training" caused injury to the plaintiffs.

### 3. Conclusion

I will grant defendants summary judgment motion regarding the failure to train claim against Mr. Khokhar, Mr. Hottenstein, and Mayor McMahon.

An appropriate order follows.