IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY ANN CIARLONE, et al. | : | Civil Case |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 09-310 |
| | : | |
| CITY OF READING, et al. | : | |
| Defendants, | : | |

## MEMORANDUM OPINION

**Stengel, J.**                                                                            **January 20, 2011**

Mary Ann Ciarlone owns 511 Oley Street, located in Reading, Pennsylvania. In 2008, Irene Lora, Orazio Gerbino, and Anne Baez each rented apartments at the property. Defendants planned a code enforcement inspection for the property and notified Ms. Ciarlone. Ms. Ciarlone requested defendants obtain a search warrant, which they did. After obtaining the warrant, Code Enforcement Administrator Brad Reinhart and Code Enforcement Inspector James Orrs searched the property. Mr. Orrs and Mr. Reinhart did not provide notice to the tenants prior to the search and used force to enter the apartments of the three tenants. Ms. Ciarlone and her tenants filed claims for violations of their constitutional rights.

The City of Reading, Mr. Reinhart, and Mr. Orrs filed this motion for summary judgment.[1] For the reasons set forth below, I will grant the motion in part and deny it in

_____

[1] Defendants Thomas McMahon, Jatinder Khokhar, and Ryan Hottenstein filed a separate motion for summary judgment and plaintiffs filed a partial motion for summary judgment. These motions are addressed in separate memorandum opinions and/or orders.

part.

I.     Background

Mary Ann Ciarlone owns a residential rental property at 511 Oley Street, Reading, Pennsylvania.[2]  Irene Lora, Anne Baez, and Orazio Gerbino live as tenants at 511 Oley Street.  Defendants' Statement of Facts ¶ 2-4.  Brad Reinhart is the codes administrator for the City of Reading, id. ¶ 5, and James Orrs was a property maintenance inspector for the City of Reading, id. at ¶ 6.  Prior to October 10, 2008, the City of Reading had not inspected 511 Oley Street since October 12,1999 and Ms. Ciarlone had not had 511 Oley Street inspected by a private inspector.  Defendants' Statement of Facts at ¶¶ 13, 34.

The City of Reading has a Property Maintenance Code and a Housing-Rental Ordinance, which requires the inspection of rental properties every three years.  Id. at ¶¶ 14-15.  Through a letter dated September 24, 2008, the City of Reading notified Ms. Ciarlone that a property maintenance inspection for 511 Oley Street was scheduled for October 7, 2008.  Id. at ¶ 17.  The City of Reading did not provide notice of the inspection to the tenants.  Id. at ¶ 18.  Ms. Ciarlone did not tell the tenants she had received a notice of inspection.  Id. at ¶ 21.

On October 7, 2008, Ms. Ciarlone taped a poster to a chair on the porch of 511

_____

[2]  See Defendants, City of Reading, Thomas McMahon, Ryan Hottenstein, Brad Reinhart, Jatinder Khokhar and James Orrs' Statement of Undisputed Facts at ¶ 1, Ciarlone v. City of Reading, No. 09-310 (E.D. Pa. filed Nov. 12, 2010).

Oley Street, stating:

> NOTICE
> 10-7-08
>
> To City of Reading: I/we want our constitutionally and charter protected rights! Attempts by you to enter these premises using police tactics are a violation of these rights. If you return with a warrant, you must immediately call 610-334-7875.
>
> I reserve the right to monitor your presence for quality assurance. Mary Ann Ciarlone

Defendants' Statement of Facts at ¶ 22.

On October 7, 2008 at 4:48 p.m., Mr. Orrs appeared at 511 Oley Street pursuant to the notice of inspection. Id. at ¶ 23. Prior to October 7, 2008, Ms. Ciarlone had never met Mr. Orrs. Id. ¶ 24. Ms. Ciarlone video recorded the encounter. Id. During the encounter, Ms. Ciarlone stated: "I am asserting my constitutionally and charter protected right to ask for a warrant." Id. at ¶ 25.

On October 9, 2008, Mr. Orrs completed an affidavit of probable cause and application for a search warrant for 511 Oley Street. Defendants' Statement of Facts at ¶ 27. City of Reading Assistant Solicitor Michelle Mayfield, Esquire, helped Mr. Orrs complete the application for a search warrant. Id. at ¶ 28. Mr. Orrs stated he consults with legal counsel when applying for a warrant, see Defendants' Motion at Exh. 6 at 60, but clarified he had made only one other application for a warrant to search rental property, id.

On the application for search warrant, where it requests "Name of Owner, Occupant or Possessor of said Premises to be Search," Officer Orrs wrote:

3

> Owners Craig A. Ciarlone and Maryann Ciarlone of 709 North 5th Street,
> Reading, County of Berks, Pennsylvania and Occupants of 511 Oley Street O.
> Gerbino, I. Lora, A. Ciarlone, A. Baez and/or John Doe 1, John Doe 2, Jane
> Doe 1 and/or Jane Doe 2.

Mr. Orrs maintained he did not include a statement of whether the tenants had granted or refused access to the property in the affidavit of probable cause "[b]ecause I talked to [Ms. Ciarlone], and she was the one that did not allow me in the property and requested a search warrant." Id. at ¶ 36. He did not recall if Ms. Ciarlone explained whether her tenants had granted or refused access. Id. Mr. Reinhart did not assist Mr. Orrs in completing the application for a search warrant and did not provide any information contained in the application. Id. at ¶ 37. Mr. Reinhart was present on October 9, 2008, when the application was submitted. Id. at ¶ 38. On October 9, 2008, District Justice Thomas H. Xavios approved the administrative search warrant. Id. at ¶ 39.

On October 10, 2008, Mr. Orrs requested a City of Reading police officer accompany him to execute the search warrant. Defendants' Statement of Facts at ¶ 41. Mr. Orrs stated it was standard procedure for police to accompany the property maintenance inspectors when executing a search warrant to provide security. See Defendants' Motion at Exh. 6 at 80. He also stated that before October 10, 2008 he had never requested the assistance of a police officer to execute a warrant, requested a warrant for a property inspection for only one other property, and had asked for police assistance only when there were open and unsecure properties that needed to be boarded up. Id. at 79.

On October 10, 2008, Mr. Orrs, Mr. Reinhart, and a police officer went to 511 Oley Street around 9:00 a.m. or 10:00 a.m. to execute the administrative search warrant. No one was present when they arrived. Mr. Reinhart instructed Mr. Orrs to return to City Hall to call Ms. Ciarlone and advise her that they would return in the afternoon to execute the search warrant. Defendants' Statement of Facts at ¶ 45. Mr. Reinhart and Mr. Orrs returned to 511 Oley Street at 4:00 p.m. on October 10, 2008. Id. at ¶ 47. Ms. Ciarlone and her friend Tina Fuhrman videotaped the execution of the search warrant. Id. at ¶ 48.

Mr. Reinhart and Mr. Orrs met two police officers at 511 Oley Street. The City of Reading Police Department policy is to send two police officers for any call. Id. at ¶ 50. One of the responding officers, Officer Eric Sweitzer, called his on-duty supervisor, Sergeant Marc Pentheny. Officer Sweitzer testified that he had never been trained "on any code enforcement procedures before October 10, 2008" and that he had never interacted with any of the codes administrators, officers, or agents before that day. Plaintiffs' the Statement of Facts at Appendix I at 8, 15, Ciarlone v. City of Reading, No. 09-310 (E.D. Pa. filed Nov. 12, 2010).

Over a period of approximately fifty minutes, Mr. Reinhart, Officer Sweitzer and Sergeant Pentheny asked Ms. Ciarlone to comply with the administrative search warrant and permit the inspection of 511 Oley Street. Defendants' Statement of Facts at ¶ 54. Ms. Ciarlone had keys to the front door and apartments. Id. at ¶ 55. There was no discussion of whether the tenants had been notified. Ms. Ciarlone stated "I am asserting

our constitutionally protected rights." Id. at ¶ 57. Mr. Reinhart testified the search did

not need to be conducted at a particular time and that if a tenant does not permit access he

can "charge a non-entry" to compel access. Response to Statement of Facts at ¶ 15, 16.

When Ms. Ciarlone refused to permit entry, Sergeant Pentheny called the Berks

County District Attorney's Office to confirm the warrant was valid and could be executed

through the use of force. Defendants' Statement of Facts at ¶ 59. Based on this

conversation, it was Sergeant Pentheny's understanding the administrative search warrant

was valid and could be executed through the use of force, if necessary. Id. at ¶ 62.

Sergeant Pentheny communicated this understanding to Mr. Reinhart. Id. at ¶ 63. Ms.

Ciarlone continued to refuse to grant entry. Id. at ¶ 65.

Mr. Orrs inspected the exterior of the property. Defendants' Statement of Facts at

¶ 66. Mr. Reinhart again advised Ms. Ciarlone to open the door. Mr. Reinhart then

knocked on the door and announced he was with the City of Reading Codes Department

and requested that the door be opened. Id. at ¶ 67. Mr. Reinhart told Mr. Orrs to break

the door. Id. at ¶ 68. Mr. Orrs struck the door with a sledge hammer six times before the

glass broke. Id. at ¶ 69. After the glass broke, Mr. Orrs hit the door four more times

before someone suggested he stick his hand in the door and turn the latch. Id.

Ms. Ciarlone refused to unlock the interior doors. Defendants' Statement of Facts

at ¶ 71. Mr. Orrs and Mr. Reinhart knocked and announced their presence at each tenant

door. Id. at ¶ 71. They broke the doors. Id. They left a signed copy of the administrative

search warrant in each unit. Id. at ¶ 73. After the officers left, Ms. Ciarlone went into each apartment and removed the search warrants. Id. at ¶ 74. She never gave the tenants a copy of the administrative search warrant or advised the tenants a search warrant had been left for them by the City of Reading. Id. at ¶ 75.

Prior to departing, Mr. Orrs issued Ms. Ciarlone a notice of violation, which required Ms. Ciarlone to, among other items, "repair all entrance doors and all windows at entrance doors." Response to Statement of Facts at ¶ 42. Ms. Ciarlone testified it was her responsibility to pay for the damage to the doors, not the tenants' responsibility. See Defendants' Statement of Facts at ¶ 77.

When Ms. Baez returned home at 8:00 p.m. she had a message on her answering machine from Ms. Ciarlone stating people who work for the City of Reading would be coming to the apartment and Ms. Baez should not let them in. Defendants' Statement of Facts at ¶ 76.

Karen Organtini, a clerk with the City of Reading Property Maintenance Division, stated Mr. Reinhart made negative comments about Ms. Ciarlone. She could not remember specific comments. Plaintiff's Statement of Facts at Appendix A at 42. In addition, another employee at the office made comments about Ms. Ciarlone, which Ms. Organtini paraphrased as "we're going – basically we're going to get in or we're going to – because she's in my areas and I have someone that isn't happy with her." Id. at 43. It was unclear whether the person who was unhappy with Ms. Ciarlone was an employee or

a tenant.   Ms. Organtini also testified that Mr. Reinhart asked her to schedule Ms. Ciarlone's properties for inspection.[3]

II.   Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply

---

[3]  An October 12, 2009 article in the Reading Eagle entitled "Suit Against Reading Codes Inspector Seeks Statement from District Judge" quotes the Honorable Wallace Scott on comments made by Mr. Reinhart that Mr. Reinhart wanted to "get" Ms. Ciarlone.  The alleged comments were made when Mr. Reinhart accompanied Code Inspector Joseph Esterly in April 2007 to submit an application for a search warrant to inspect a different property owned by Ms. Ciarlone.

Plaintiffs maintain this statement is admissible through a hearsay exception because Judge Scott is unavailable.  The motion to quash the subpoena was granted and the later attempts to subpoena Judge Scott were denied.  Defendants maintain this is triple hearsay.  Even if Judge Scott's statement is admissible, the article is inadmissible hearsay.

by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" Fed. R. Civ. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III.    Discussion

A.    The Fourth Amendment

Count I of the complaint concerns the October 10, 2008 inspection and search of 511 Oley Street, and claims the failure of the defendants to obtain the consent of the tenants and the use of the sledge hammer to execute the warrant violated the Fourth Amendment.[4]  Count III alleges a violation of the tenants' right to privacy.  First Amended Complaint at ¶¶ 197-204.

To state a section 1983 claim, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).  The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  A "search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."  Camara v. Mun. Court of City and Cnty. of San Francisco, 387 U.S. 523, 528 (1968).  In Camara, the United States Supreme Court held "administrative searches . . . are significant intrusions

_____

    [4]  First Amended Complaint at ¶¶ 137-167, Ciarlone v. City of Reading, No. 09-310 (E.D. Pa. filed Apr. 7, 2009).

10

upon the interests protected by the Fourth Amendment, . . . such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual." <u>Camara</u>, 387 U.S. at 534.

1.    <u>Probable Cause to Issue an Administrative Search Warrant</u>

Probable cause to issue an administrative search warrant exists "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." <u>Camara</u>, 387 U.S. at 538.  Standards for conducting such searches "will vary with the municipal program being enforced, [and] may be based upon the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area." <u>Id.</u> at 538.  A warrant procedure guarantees "a decision to search private property is justified by a reasonable governmental interest." <u>Id.</u> at 539.  Reasonableness is the "ultimate standard." <u>Id.</u>  The <u>Camara</u> court noted "warrants should normally be sought only after entry is refused." <u>Id.</u>

The City of Reading Property Maintenance Code states "[p]roperties covered under this Code shall be inspected routinely when possible every three (3) years or as part of a planned inspection being conducted pursuant to a systematic or concentrated code enforcement program in that portion of the city." <u>See</u> Defendant's Statement of Facts at Exh. 12, at 6.  If an "owner, occupant or other person in charge of a structure . . . refuses, impedes, inhibits, interferes with, restrict [sic] or obstructs entry and free access to every

11

part of the structure or premises where inspection authorized by this Code is sought, the administrative authority shall promptly apply for a search or inspection warrant." Id. at 7.

Similarly, the City of Reading Housing-Rental Ordinance provides "[a]n inspection of the dwelling unit or rooming unit shall be performed every three (3) years." See Defendant's Statement of Facts at Exh. 13 at 10. The Ordinance allows the administrative authority to apply for a search warrant if the "owner, occupant or other person in charge of a structure . . . refuses, impedes, inhibits, interferes with, restrict [sic] or obstructs entry and free access to every part of the structure or premises." Id. at 12.

The United States Supreme Court in Camara stated:

> [M]ost citizens allow inspections of their property without a warrant. Thus, as a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry.

387 U.S. at 539-40. The statement that "a warrant should normally be sought only after entry is refused" was dicta and not central to the Court's holding. Immediately before the quoted portion, the Court stated: "[I]n the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day." Id. at 539.

In addition, the plaintiff in Camara was a tenant. The government had obtained consent from the landlord to search the building but had not obtained the consent of the tenant. The court found the plaintiff, a tenant, "had a constitutional right to insist that the inspectors obtain a warrant to search . . . ." Camara, 387 U.S. at 540. The government

did not contend the landlord's consent was sufficient to authorize the inspection of the tenant's premises.  Id.

There is a genuine issue of material fact regarding whether the tenants' Fourth Amendment rights and the tenants' right to privacy were violated. The defendants failed to provide notice prior to the planned routine search and prior to executing the search warrant.  Regardless whether the Property Maintenance Code and Housing-Rental Ordinance required notice to tenants,[5] the tenants have a right to privacy in their rental homes, Chapman v. United States, 365 U.S. 610, 616-18 (1961).  Whether the failure to provide notice prior to the search of their homes was reasonable under the Fourth

_____

[5]    The parties dispute whether the Property Maintenance Code and Housing-Rental Ordinance require notice to the tenants.  The sections addressing notice of an inspection require notice only to the property owner or representative to the owner.  See Defendants' Motion at Exh. 12; Defendants' Motion at Exh. 13 at 12.  Notice of a violation must be sent to the person responsible for the violation. Defendants' Motion at Exh. 12 at § 107.1 - 107.2.  Official notices must be served on the owner and local responsible agent and must be posted at the dwelling unit or rooming unit.  Defendants' Motion at Exh. 13 at 12.  In addition,  Pennsylvania Rule of Criminal Procedure 207 provides: "an officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purposes to any occupant of the premises specified in the warrant, unless exigent circumstances require the officer's immediate forcible entry."

      Plaintiffs maintain any interpretation of the codes that would condone not providing notice to a tenant prior to an inspection of his rental home would violate the tenant's right to privacy.  See 1 Pa. Cons. Stat. Ann. § 1922 (when ascertaining the intent of the General Assembly, a court must presume "the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth.").  Defendants maintain the rules of statutory construction require a reading of the Property Maintenance Code which requires notice of an inspection only by informing the owner or representative of the owner.  The other notice sections do not apply to notification of an inspection.  If they did, the section addressing notice requirements for inspections would be surplusage.  See 1 Pa. Cons. Stat. § 1921(a) (" . . . Every statute shall be construed, if possible, to give effect to all its provisions.").

Amendment is a question for the jury.

### b. Material Omission

Defendants contend the failure to advise the judge that the tenants had not been provided notice was not a material omission from the affidavit.

To establish there was a material omission, "the plaintiff must prove, by a preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." Sherwood v. Mulvihill, 113 F.3d. 396, 399 (3d Cir. 1997).

There is a genuine issue of material fact regarding whether Mr. Orrs "knowingly and deliberately, or with a reckless disregard for the truth," omitted information concerning the failure to seek consent from the tenants.

There was a sign on the door of 511 Oley Street stating:

To City of Reading: I/we want our constitutionally and charter protected rights!  Attempts by you to enter these premises using police tactics are a violation of these rights.  If you return with a warrant, you must immediately call 610-334-7875.

Defendant's Statement of Facts at Exh. 15.  Mr. Orrs did not mention this sign in his Affidavit or during his deposition.  He testified he did not include a statement concerning whether the tenants consented because Ms. Ciarlone was the person who refused access.

14

Moreover, a jury could find the omission was "material, or necessary, to the finding of probable cause."  Because Ms. Ciarlone requested the search warrant, it was required to gain access to the building even if the tenants had consented to an inspection of their apartments.  Mr. Orrs, however, knew a landlord could not consent on the tenants' behalf, knew the tenants had a right to grant or deny access, and knew tenants had a constitutional right to object to the inspection.  Plaintiff's Statement of Facts at Appendix G at 53-54.

### 2.    Execution of the Search Warrant

Defendants maintain the use of force did not violate the Fourth Amendment because the damage was only to the locked doors which prevented the execution of the warrant.  They argue that Mr. Orrs, not Mr. Reinhart, used a sledge hammer on the door and, therefore, the Fourth Amendment claim against Mr. Reinhart should be dismissed.

The Fourth Amendment's "general touchstone of reasonableness . . . governs the method of execution of the warrant."  United States v. Ramirez, 523 U.S. 65, 71 (1998).  "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though entry itself is lawful."  Id.

A genuine issue of material fact exists regarding whether the use of force to execute a warrant issued to conduct a routine property inspection was reasonable where the tenants did not have notice of the inspection and there were less destructive means

available to gain access to the property.  Mr. Orrs and Mr. Reinhart failed to even contact the tenants to determine whether they would consent to a search of the apartments before using force to gain access.  In addition, the defendants could have used monetary fines or a locksmith to gain access to the property instead of force when Ms. Ciarlone refused to grant access.  An issue of fact exists as to whether Mr. Orrs used excessive force, and an issue of fact remains as to whether Mr. Reinhart is liable because he made the decision to use the sledge hammer.[6]

B.    Substantive Due Process Rights

The fourth cause of action alleges violations of the plaintiffs' Fourteenth Amendment substantive due process rights.  It alleges the selection of Ms. Ciarlone's property for inspection and the use of a sledge hammer on only Ms. Ciarlone's property violated her substantive due process rights.

The United States Supreme Court has held that because the Fourth Amendment "provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  Graham v.

_____

[6] Defendants also maintain the tenants cannot state a claim based on the execution of the search warrant because Ms. Ciarlone paid for the damage to the door.  Defendants cite no law to support this argument and plaintiffs make no argument regarding this claim.  The complaint not only seeks compensatory damages, it also seeks nominal damages, reasonable costs of suit, attorneys' fees, and punitive damages.

Connor, 490 U.S. 386, 395 (1989). "Challenges to the reasonableness of a search by government agents clearly fall under the Fourth Amendment, and not the Fourteenth." Conn v. Gabbert, 526 U.S. 286, 293 (1999).

Plaintiffs maintain the claim does not challenge the execution of the search. Rather, the Fourteenth Amendment claim challenges the selection of Ms. Ciarlone's property and the use of a sledge hammer on only Ms. Ciarlone's property as violations of the Fourteenth Amendment.[7]  Because plaintiffs claim is that the use of force on only Ms. Ciarlone's property violated her due process rights, it is distinct from the Fourth Amendment excessive force claim.

"'[T]he core of the concept' of due process is 'protection against arbitrary action' and . . . 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" United States Theatre Circuit, Inc. v. Twp. of Warrington, PA, 316 F.3d 392, 399 (3d Cir. 2003) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)). "The exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case." Sanford v. Stiles, 456 F.3d 298, 306 (3d Cir. 2006) (quoting Miller v. City of Phila., 174 F.3d 368, 375 (3d Cir. 1999)).

511 Oley Street was to be searched pursuant to the Property Maintenance Code and

---

[7]  To distinguish this claim from the Fourth Amendment claim, the plaintiffs state "[t]he novelty of the use of force in executing a planned routine inspection reveals the disparate treatment to which the Plaintiffs were subjected to in this case."  Plaintiffs' Memorandum at 18.

the Housing-Rental Ordinance. After Ms. Ciarlone requested a search warrant, Mr. Orrs obtained a warrant. The defendants asked Ms. Ciarlone to open the doors to the property numerous times, spoke with a district attorney prior to using force, and used force only to gain entry. In addition, no other owner refused to allow the inspectors into the property after a warrant had issued.

Ms. Ciarlone, however, presents evidence Mr. Reinhart requested her property be searched and argues both the plaintiff expert and the defendant expert testified that no model code provision or requirement would sanction the use of a sledge hammer to conduct a planned routine inspection. In addition, the defendants had time to deliberate and contemplate the decision to use a sledge hammer and it was not an exigent circumstance. After force was used on Ms. Ciarlone's property, the Council of the City of Reading passed Resolution 107-2008, which provided: "[T]he Codes Department is not to undertake any forced entry inspections of private properties until a standard operating procedure is reviewed and/or developed and approved. . . ."

Ms. Ciarlone establishes a question of fact regarding whether the use of a sledge hammer on her property "shock[s] the conscience." Because Mr. Orrs and Mr. Reinhart had time to contemplate the use of force and its alternatives, a jury could find the actions are "egregious official conduct" that are "arbitrary in the constitutional sense." See United States Theatre Circuit, Inc., 316 F.3d at 399.

C.    Retaliation

Ms. Ciarlone alleges the defendants violated her First Amendment right to be free from retaliation.  To establish a First Amendment retaliation claim, a plaintiff must prove the following elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006) (citing Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003)).


1.    Inspector Orrs

Before the inspection, Ms. Ciarlone had never met, or heard of, Mr. Orrs.  Ms. Ciarlone testified at her deposition that she did not believe Mr. Orrs harbored animosity toward her because she was a member of the Centre Park Historic District, a member of the City of Reading Historic and Architectural Review Board, or a member of the Real Estate Investors Association.  See Defendants' Motion at Exh. 1 at 240-249.  In addition, Mr. Orrs testified he did not know Ms. Ciarlone prior to the search of her property. Defendants' Motion at Exh. 6 at 45:9-12.

Ms. Ciarlone argues Mr. Orrs retaliated against her because she filed a complaint with the Home Rule Charter Review Board against Jatinder Khokhar, the former department manager of the Office of Code Services.  This complaint was filed in

December 2007.  Ms. Ciarlone also maintains the evidence establishes "a general knowledge and animosity harbored" against her "by all employees and officials in charge of code enforcement in the City of Reading."  Response to Statement of Facts at ¶¶ 123, 125.

Ms. Ciarlone failed to present sufficient evidence to raise a genuine issue of material fact regarding whether Mr. Orrs retaliated against her because of protected conduct.  Ms. Ciarlone fails to establish Mr. Orrs knew who she was, let alone that he was aware of protected conducted she participated in and retaliated against her due to her participation.

2.    Administrator Reinhart

Ms. Ciarlone testified at her deposition that she did not believe Mr. Reinhart harbored animosity toward her because she was a member of the Centre Park Historic District or because she was a member of the City of Reading Historic and Architectural Review Board.  See Defendants' Motion at Exh. 1 at 240-245.  Ms. Ciarlone testified she did not know whether Mr. Reinhart harbored animosity toward her because she was a member of the Real Estate Investors Association.  Id. at Exh. 1 at 246.  She stated "[h]e may have animosity toward the organization, but me individually as a member of the organization, probably no."  Id.  She believes he may harbor animosity toward the organization because "individuals within the organization have utilized tools in the

charter that were about things that City Hall had done." Id. Ms. Ciarlone again relies on the complaint she filed against Mr. Khokhar in December 2007 and the "general knowledge and animosity" harbored against her by code enforcement personnel.

Ms. Ciarlone relies on the deposition testimony of Karen Organtini, an office worker at the City of Reading Property Maintenance Division. Ms. Organtini stated Mr. Reinhart had made negative comments about Ms. Ciarlone, see Plaintiff's Motion at Exh. 12 at 44, and another employee at the office made comments about Ms. Ciarlone, which Ms. Organtini paraphrased as "we're going – basically we're going to get in or we're going to – because she's in my areas and I have someone that isn't happy with her." Id. at 43. Ms. Organtini testified that Mr. Reinhart asked her to schedule all of Ms. Ciarlone's properties for inspection. Id. at 29-33. Ms. Organtini also testified that 511 Oley Street was to be scheduled for inspection pursuant to the computer generated list and all of Ms. Ciarlone's properties were not scheduled for inspection.[8]

Ms. Ciarlone fails to establish a retaliation claim against Mr. Reinhart. Ms. Ciarlone fails to establish a jury could find Mr. Reinhart retaliated against her because of

---

[8] Ms. Ciarlone also relies on the statement by Judge Scott in the Reading Eagle that, when applying for a search warrant on a different property in April 2007, Mr. Reinhart stated "I can't wait to get back at that b****." Judge Scott's motion to quash the subpoena for his deposition and testimony was granted, and plaintiffs' later attempts to subpoena Judge Scott were denied. In addition, the plaintiffs' motion for interlocutory appeal was denied.

Plaintiffs maintain this statement is admissible through a hearsay exception because Judge Scott is unavailable. Defendants maintain, even if Judge Scott is unavailable, the newspaper article also is a hearsay statement and does not satisfy any hearsay exception. Even if Judge Scott's statement was considered, Ms. Ciarlone fails to establish the comment was connected to any protected activity.

any protected conduct. She fails to provide any evidence to connect the negative comments to protected conduct.


D. <u>Failure to Educate and Train</u>

Plaintiffs allege a failure to educate and train claim against Mr. Reinhart. A plaintiff alleging a failure to train claim must show "the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." <u>Carter v. City of Phila.</u>, 181 F.3d 339, 357 (3d Cir. 1999) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989)). The "failure to train may amount to deliberate indifference where the need for more or different training is obvious, and inadequacy very likely to result in violation of constitutional rights." <u>Id.</u>

Ms. Ciarlone fails to establish a jury could determine Mr. Reinhart is liable for the failure to train. She fails to establish he was deliberately indifferent. She presents no evidence the need for additional training was obvious or that inadequate training likely would result in a violation of constitutional rights. Ms. Ciarlone has come forward with no evidence one way or the other of a failure to train. She certainly can point to no facts that suggest any failure to train caused her harm.


E. <u>Qualified Immunity</u>

Qualified immunity shields government officials performing discretionary

functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights known to a reasonable person. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Courts apply a two-step inquiry to determine whether a defendant is entitled to qualified immunity. First, a court must determine whether a constitutional right was violated. Second, a court must determine whether the right was clearly established such that a reasonable officer would have known the conduct violated their rights. Saucier v. Katz, 533 U.S. 194, 201-02 (2001). In Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009), the Supreme Court found a court may address whether a right was clearly established before addressing whether a constitutional right was violated.

        1.     Probable Cause

Defendants maintain, if notice to a tenant was a constitutional requirement, the requirement was not clearly established as of October 10, 2008. The language in Camara stating "it seems likely that warrants should normally be sought only after entry is refused" is dicta and the Property Maintenance Code required notice be provided to only the landlord. Defendants also maintain Mr. Orrs consulted with a district attorney in preparing the application for a search warrant.

In Kelly v. Borough of Carlisle, 622 F.3d 248, 255-56 (3d Cir. 2010), the United States Court of Appeals for the Third Circuit found if a police officer "relies in good faith

on a prosecutor's legal opinion," he is "presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." The reliance, however "must itself be objectively reasonable . . . because 'a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one.'" Kelly, 622 F.3d at 256 (quoting Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004)). To rebut this presumption, the plaintiff must show "that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." Id.

The advice of the assistant city solicitor creates a presumption the action was reasonable. It is unclear, however, whether the assistant city solicitor was aware the tenants were not notified of the inspection or provided an opportunity to open their doors for the inspector. In addition, the plaintiffs present evidence that the inspectors, officers and officials involved understood the tenants had a right to privacy in their apartments. The plaintiffs establish a genuine issue of material fact concerning whether a reasonable officer would have believed a warrant obtained to search an apartment was valid if the tenants had not been provided with notice of the search and whether a reasonable officer would have relied on the attorney's advice.


2.    Execution of the Search Warrant

There is no requirement that a search warrant "must include a specification of the

precise manner in which they are to be executed." <u>Dalia v. United States</u>, 441 U.S. 238, 257 (1979). "[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant – subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.'" <u>Id.</u>

A genuine issue of material fact exists regarding whether the use of the sledge hammer was objectively reasonable and whether a reasonable officer would have relied on the attorney's advice. Sergeant Pentheny spoke with an assistant district attorney prior to defendants' use of force, and the only damage was to the doors which prevented them from executing the warrant, but Mr. Orrs and Mr. Reinhart failed to contact the tenants prior to using force on the tenant doors to execute the warrant and used a sledge hammer to gain access to the property and apartments.

IV.   <u>Conclusion</u>

I will deny the motion for summary judgment for the tenants' Fourth Amendment claim, the right to privacy claim, Ms. Ciarlone's Fourth Amendment claim, Ms. Ciarlone's Fourteenth Amendment due process claim and the claim for qualified immunity. I will grant the motion for summary judgment for the First Amendment retaliation claim.

An appropriate order follows.